Isaacs v. Dartmouth-Hitchcock (CORRECTED) 12-cv-40-LM    4/18/14

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Dr. J.D. Isaacs

   v.

Dartmouth-Hitchcock Medical
Center, Mary Hitchcock
Memorial Hospital, Dr.
Christine T. Finn, and the
Trustees of Dartmouth College

Civil No. 12-cv-040-LM
Opinion No. 2014 DNH 086
(Corrected Opinion No.)


## O R D E R

Dr. J.D. Isaacs, a former resident in psychiatry in the Graduate Medical Education ("GME") program at Dartmouth-Hitchcock Medical Center ("Dartmouth-Hitchcock"), has sued four defendants and asserts ten claims, arising from either the treatment he received during his Dartmouth-Hitchcock residency or his dismissal from it.  Before the court are two motions for summary judgment.  One of them was filed by Dartmouth-Hitchcock and Mary Hitchcock Memorial Hospital ("Mary Hitchcock").  Those two defendants shall be referred to, collectively, as the "Hitchcock defendants."  The other summary-judgment motion was filed by Dr. Christine Finn, director of the Dartmouth-Hitchcock Psychiatry Residency Program, and the Trustees of Dartmouth College ("Trustees").  Those two defendants shall be referred to, collectively, as the "Dartmouth defendants."  Dr. Isaacs,

currently proceeding pro se, has not objected to either motion for summary judgment.  For the reasons that follow, both motions for summary judgment are granted in full.

While Dr. Isaacs has not objected to either of the pending summary-judgment motions, he has filed a motion for a scheduling conference in which he: (1) asks the court to appoint counsel to review forty hours of videotaped depositions he has conducted, to search for irregularities; and (2) states that he "is . . . of the belief that it is wholly inappropriate for opposing counsel to have filed a motion for summary judgment, when discovery is not yet complete," doc. no. 140, at 2.  But, he has identified no authority that would support his request for appointment of counsel, nor has he sought relief under Rule 56(d) of the Federal Rules of Civil Procedure ("Federal Rules").  Accordingly, his motion for a scheduling conference, document no. 140, is denied.

## Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Ponte v. Steelcase Inc., 741 F.3d 310, 319 (1st Cir. 2014) (quoting Cortés-Rivera v. Dept. of Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, the

2

court must "view[] the entire record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" Winslow v. Aroostook Cty., 736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). In other words, "the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting

3

Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998))
(internal quotation marks omitted).

**Background**

As noted, Dr. Isaacs has not filed an objection to either
of the two pending summary-judgment motions.  Necessarily, he
has presented the court with no "short and concise statement of
material facts, supported by appropriate record citations, as to
which [he] contends a genuine dispute exists so as to require a
trial."  LR 56.1(b).  Accordingly, all the properly supported
material facts in the moving parties' factual statements are
deemed admitted.  See id.  Those facts, along with others
gleaned by the court from the summary-judgment record, see Fed.
R. Civ. P. 56(c)(3), serve as the basis for the following
recitation of the relevant factual background.

In 2005 and 2006, Dr. Isaacs attended medical school at the
University of Southern California ("USC").  During his first
year, he was suspended and ultimately dismissed for harassing a
classmate.  From August of 2006 through April of 2010, Dr.
Isaacs attended the American University of the Caribbean,
Netherlands Antilles, and was awarded an M.D. degree in 2010.

In an Electronic Residency Application Service ("ERAS")
application that Dr. Isaacs submitted in September of 2009 to
the University of Arizona ("UA") Department of Surgery, he

omitted his attendance at USC from a listing of his medical education.[1]  Based upon the 2009 ERAS application, Dr. Isaacs was offered a residency in general surgery at UA.  He began his UA residency in July of 2010.  Approximately three weeks later, he was issued a Notice of Deficiency that cited, among other things, his "[d]emonstrated incompetence in professional activities related to the fulfillment of assigned duties and responsibilities associated with [his] position."  Defs.' Mem. of Law, Ex. 11 (doc. no. 144-12), at 1.[2]  About three weeks later, Dr. Isaacs was notified that he was going to be put on probation, "based upon his performance and his poor evaluations."  Id., Ex. 7 (doc. no. 144-8), at 8.  In response, he resigned.

---

[1] The process by which residents find their residencies works like this: "Individuals interested in participating in a residency program submit a standardized application through the Electronic Residency Application Service (ERAS).  The decision to extend an invitation to an applicant is based upon a review of their completed ERAS application.  After the ERAS application is submitted and interviews are conducted, applicants may then match with a specific training program through a process overseen by the National Residency Match Program.  When a candidate 'matches' with a program, that program is obligated to start them as long as they satisfy eligibility requirements."  Defs.' Mem. of Law, Ex. 32, Bertrand Aff. (doc. no. 144-33) ¶¶ 5-8.

[2] The Notice of Deficiency also cited "[p]ersonal conduct that substantially impaire[d] [Dr. Isaacs'] fulfillment of properly assigned duties and responsibilities," and his "[i]nability or failure to perform the essential functions of the job or tasks assigned."  Defs.' Mem. of Law, Ex. 11 (doc. no. 144-12), at 1.

In September of 2010, Dr. Isaacs submitted an ERAS application to Dartmouth-Hitchcock. In that application, he omitted both his attendance at USC and his aborted residency at UA. Based upon his application, Dr. Isaacs was offered admission to the Dartmouth-Hitchcock residency program in psychiatry, which entailed employment as a resident at Mary Hitchcock. In connection with accepting Dartmouth-Hitchcock's offer, Dr. Isaacs stated, among other things, that he had never "voluntarily resigned or withdrawn from any hospital or licensed facility due to professional misconduct, incompetence or negligence." Defs.' Mem. of Law, Ex. 15 (doc. no. 144-16), at 1. He also agreed to the following condition of employment:

> Misrepresentation or omission of material information from my employment application, my C.V., or other documents related to my application, may result in rejection of my application or, if I am hired, termination of my employment.

Id. at 2.

Also in conjunction with his acceptance of Dartmouth-Hitchcock's offer of admission, Dr. Isaacs completed a data form that included information necessary for Mary Hitchcock to fulfill its reporting obligations to the Equal Employment Opportunity Commission ("EEOC"). On that form, Dr. Isaacs indicated that he did not "have a handicap or disability," Defs.' Mem. of Law, Ex. 16 (doc. no. 144-17), and when asked to "describe any reasonable accommodation that the Hospital could

6

consider enabling [him] to perform [his] job in a safer or better manner," id., Dr. Isaacs responded: "NA," id.

After accepting his offer of admission from Dartmouth-Hitchcock, Dr. Isaacs signed a Resident Agreement of Appointment covering his employment by Mary Hitchcock. That agreement specified that Dr. Isaacs' appointment at Mary Hitchcock was for one year, and also provided as follows:

> Continued participation in an academic program at [Dartmouth-Hitchcock Medical Center] is required for this agreement to remain in force. Termination from your academic program will terminate this agreement.
>
> Mary Hitchcock Memorial Hospital may terminate this agreement and any obligations it may have there under at any time upon any reasonable basis which shall be deemed to include failure to satisfy the academic requirements of the program; failure to progress in knowledge or performance at a satisfactory rate; failure to attain or demonstrate competence in any of the core competencies; or conduct unbecoming a physician.

Defs.' Mem. of Law, Ex. 18 (doc. no. 144-19), at 3.

The same day he signed the appointment agreement, Dr. Isaacs also signed an application for a training license from the State of New Hampshire Board of Medicine. In a supplement to that application, Dr. Isaacs indicated that he had resigned from a medical education program, but also indicated that he had never "been reprimanded, sanctioned, restricted or disciplined in any activities involving medical education or practice." Defs.' Mem. of Law, Ex. 19 (doc. no. 144-20), at 3. By way of

explanation for his resignation from the UA residency program, Dr. Isaacs wrote:

> I was employed as a preliminary surgery resident at the University of Arizona for approximately six weeks, between July - August 2010. I resigned, in good standing, from the program, and with permission from the program director. At the time, the program was under . . . probation and I felt that the program was not a good fit with my overall career plans. I planned to reapply to categorical programs in 2011 [which] would allow me to pursue my interest in the neurosciences, and [I] succeeded in finding such a program at [Dartmouth-Hitchcock].

Id. at 4.

Dr. Isaacs began his Dartmouth-Hitchcock residency on June 26, 2011, with an internal-medicine rotation. Within five days, he was given a reduced patient load, due to concerns over his ability to handle a full load. In the e-mail explaining the reduction in duties, Dr. Harley Friedman, director of Dartmouth-Hitchcock's internal-medicine residency program, also cited concerns over Dr. Isaacs' punctuality, preparation for rounds, handling of his pager, and note writing. Several days later, Dr. Friedman removed Dr. Isaacs from the internal-medicine service. In an e-mail to Dr. Finn, Dr. Friedman noted a number of performance-related issues and also stated that "[a]s far as we can tell, his medical knowledge is zero." Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed)), at 16.

In mid September of 2011, Dr. Finn placed Dr. Isaacs on a performance improvement plan ("PIP"), a step that she had

8

contemplated as early as July 13, a mere three weeks into his residency. See Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed), at 7. In the PIP, she noted "a concern for lack of details [presumably in patient notes], gaps in clinical knowledge, repeated lateness, and limited self direction." Id., Ex. 21 (doc. no. 134-22 (sealed)), at 1.

In early 2012, Dr. Isaacs began a second rotation in internal medicine. On January 11, Dr. Friedman removed him from the internal-medicine service for a second time. In an e-mail to Dr. Finn, Dr. Friedman noted Dr. Isaacs' continuing problems with punctuality and described an incident in which Dr. Isaacs reported, on a patient chart, that he had examined the patient when, by his own subsequent admission, he had not. Furthermore, Dr. Friedman stated that Dr. Isaacs explained that his error on the chart resulted from his copying a previous day's note, rather than writing a new one – a practice he had previously been told to avoid.

On January 13, Dr. Finn met with Dr. Isaacs to discuss performance issues on his internal-medicine rotation. They also discussed his application to Dartmouth-Hitchcock and his failure to disclose his UA residency. Dr. Finn concluded her note on the January 13 meeting this way:

> I informed Jeff that he would be placed on
> administrative leave, effective immediately, while we
> sorted out the options available to him. When asked

9

what that might include, I let him know that remediation of current deficiencies, dismissal from the program, and resignation were the 3 available options at this time.  He was provided a copy of the grievance policies and procedures, and indicated his plan to contact GME today to appeal the decision to place him on administrative leave.

Defs.' Mem. of Law, Ex. 23 (doc. no. 134-24 (sealed)), at 2.

By letter dated March 19, Dr. Isaacs was "dismiss[ed] from the adult psychiatry residency training program at the Dartmouth Hitchcock Medical Center."  Defs.' Mem. of Law, Ex. 1 (doc. no. 144-2), at 1.  Dr. Isaacs' dismissal letter, which was signed by Drs. Finn and Marc Bertrand, Dartmouth-Hitchcock's Associate Dean for Graduate Medical Education, stated, in pertinent part:

> The decision to dismiss you from your position in the residency is based on academic deficiency issues as well as behavior incompatible with the role of a physician including the omission of material information from your Electronic Residency Application Service (ERAS) application, falsification of information provided to the New Hampshire Board of Medicine, and false reporting in a patient's electronic medical record as well as other substantiated competency and integrity concerns.

> Specifically, your ERAS application lacked information regarding your prior residency training in Arizona as well as time served as a medical student at the University of Southern California.  You also failed to divulge your dismissal from medical school at USC in information provided to the New Hampshire Board of Medicine in support of a NH training license. Concerns have been raised during rotations on both psychiatry and internal medicine regarding false reporting in the medical record and appropriation of medical student notes as our own.

> You received feedback regarding academic performance concerns beginning in your first week of residency

10

training and were subsequently removed from internal medicine rotations on two separate occasions due to deficits in knowledge, professionalism issues, and inability to perform basic PGY-1 level tasks when caring for patients. Furthermore, you have failed to achieve a performance level in psychiatry that would allow progression to PGY-2 year duties.

Id. The letter also indicated that Dr. Isaacs was being provided with a copy of the GME grievance process and procedures, and told him how to initiate the process. Dr. Isaacs began to grieve his dismissal, but ultimately abandoned his grievance.

The record includes a copy of a "Notice of Charge of Discrimination" submitted by Dr. Isaacs to the Boston office of the EEOC and bearing a date of May 21, 2012. The notice, which was directed to the director of human resources at Dartmouth-Hitchcock, identified claims of disability discrimination and retaliation, listed Dr. Isaacs' "discharge" as the act of discrimination and/or retaliation, and specified March 19, 2012, as both the earliest and the latest date of the action he was complaining about. While Dr. Isaacs' amended complaint mentions his EEOC filing, it includes no allegation that he ever filed a complaint with the New Hampshire commission for human rights, and the summary-judgment record includes no such complaint.

Dr. Isaacs filed two separate complaints in this court asserting claims arising from his residency, one in February of

11

2012, and one in October of that year.  Those two cases were later consolidated.

In the amended complaint that followed consolidation, which was filed by an attorney who has since withdrawn from this case, Dr. Isaacs asserts the following claims: (1) violation of the ADA, against Dartmouth-Hitchcock, Mary Hitchcock, and the Trustees (Count I); (2) wrongful termination, against Dartmouth-Hitchcock (Count (II); (3) violation of RSA 354-A, against the three institutional defendants (Count III); (4) breach of contract, against Dartmouth-Hitchcock (Count IV); (5) breach of the covenant of good faith and fair dealing, against Dartmouth-Hitchcock (Count V); (6) negligent misrepresentation, against all four defendants (Count VI); (7) violation of Section 504 of the Rehabilitation Act, against the three institutional defendants (Count VII); (8) fraud, against all four defendants (Count VIII); (9) intentional infliction of emotional distress, against all four defendants (Count IX); and (10) negligent infliction of emotional distress, against all four defendants (Count X).

## Discussion

In the motions now before the court, two pairs of defendants each move for summary judgment on each of the claims asserted against them.  The court proceeds count by count.

12

A.  Count I

In Count I, Dr. Isaacs asserts claims under the ADA against Dartmouth-Hitchcock, Mary Hitchcock, and the Trustees. Specifically, he alleges that all three defendants: (1) discriminated against him, in violation of the ADA, by failing to make reasonable accommodations for his mental disability and by denying him employment opportunities; and (2) discriminated against him and/or retaliated against him, in violation of the ADA, by subjecting him to undue scrutiny and criticism.  In the discussion that follows, the court considers each defendant individually.

1. Dartmouth-Hitchcock

Dartmouth-Hitchcock is entitled to judgment as a matter of law on the merits of Dr. Isaacs' ADA claims.  Those claims, in turn, involve three separate theories of liability: (1) disability discrimination in the form of failure to accommodate; (2) disability discrimination in the form of other adverse employment actions; and (3) retaliation.

a. Failure to Accommodate

Dr. Isaacs alleges that he has "a well-established neuropsychiatric disability stemming from a 1997 [head] injury," Am. Compl. ¶ 25, and that "his mental impairments substantially limit one or more major life activities," id. ¶ 39.  He asserts that Dartmouth-Hitchcock violated the ADA by denying requests

13

for reasonable accommodations that he made on four occasions: (1) in early September of 2011, see id. ¶¶ 55, 57; (2) on Thanksgiving weekend, see id. ¶¶ 61-62; (3) "[s]everal days later," id. ¶ 63; and (4) "over the next few weeks," id. ¶ 65. The Hitchcock defendants argue that the evidence in the summary-judgment record is insufficient to demonstrate that Dr. Isaacs ever made a sufficiently specific request for an accommodation. The court agrees.

"The ADA prohibits discrimination against a 'qualified individual' because of the individual's disability 42 U.S.C. § 12112(a), a prohibition which includes any failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability,' id. § 12112(b)(5)(A)." Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 197-98 (1st Cir. 2011) (citing Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002)). With regard to the elements of an ADA discrimination claim:

> Under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff in a disability discrimination case must first make out a three-factor prima facie case. Ordinarily, the plaintiff must show that he (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in part because of his disability. See Richardson v. Friendly Ice Cream Corp., 594 F.3d 69, 74 (1st Cir. 2020); García-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 646 (1st Cir. 2000).

14

Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86-87 (1st Cir. 2012) (footnote and parallel citations omitted). While the Hitchcock defendants say that they "assume that a prima facie case can be made," Defs.' Mem. of Law (doc. no. 144) 10, that appears to be a misstatement because, rather than arguing that there was a non-pretextual reason for denying Dr. Isaacs' requests for accommodations, at the third step of the McDonnell Douglas analytical framework, they argue that Dr. Isaacs never made a proper request for an accommodation in the first instance, which is a challenge to his prima facie case.

To establish the third element of a prima facie case of disability discrimination, where the adverse employment action alleged by the plaintiff is a failure to provide a reasonable accommodation, "the plaintiff must show that the employer knew about plaintiff's disability and did not reasonably accommodate it." Jones, 696 F.3d at 89 (citing Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 102 (1st Cir. 2007); Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003)). The Jones court continued:

> A plaintiff must explicitly request an accommodation, unless the employer otherwise knew one was needed. Freadman, 484 F.3d at 102. An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability. Id.; see also Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 129 (1st Cir. 2009). The obligation is on the employee to provide sufficient information to put the employer on notice

15

of the need for accommodation.  B. Lindemann & P. Grossman, Employment Discrimination Law ch. 5.III, at 269 (4th ed. 2007) (citing 29 C.F.R. § 1630.2(o) app. (2005)).  This means not only notice of a condition, but of a "causal connection between the major life activity that is limited and the accommodation sought."  Id. ch. 13.VI.D.1, at 880 (quoting Wood v. Crown Redi-Mix, Inc., 339 F.3d 682, 687 (8th Cir. 2003)) (internal quotation mark omitted).

696 F.3d at 89.

Here, Dr. Isaacs' amended complaint includes these allegations concerning his request for an accommodation: (1) "[i]n early September Plaintiff requested medical leave or an accommodation for his disability," Am. Compl. ¶ 55; (2) "after being informed of Plaintiff's condition Defendant Finn refused any accommodation for the Plaintiff's disability," id. ¶ 58; (3) "[d]uring an overnight Thanksgiving shift, Plaintiff . . . requested immediate medical leave to a supervising fellow," id. ¶ 61; (4) "[s]everal days later the Plaintiff requested medical leave directly from his Program Director Defendant Finn," id. ¶ 63; and (5) "[p]laintiff, over the next few weeks, requested accommodations from his Program Director Defendant Finn," id. ¶ 65.  Those allegations provide little if any additional detail concerning how, exactly, Dr. Isaacs framed his requests, and the conclusory nature of those allegations makes it difficult to conclude that Dr. Isaacs has alleged enough to state a claim that he made requests for accommodations that comply with the requirements of Jones.

In any event, at summary judgment, Dr. Isaacs has failed to produce evidence that creates a triable issue on that element of his claim. For one thing, it is undisputed that Dr. Isaacs himself concealed his alleged disability from Dartmouth-Hitchcock in the paperwork he completed in connection with the start of his residency and, in addition, expressly declined to ask for any accommodation. See Defs.' Mem. of Law, Ex. 16 (doc. no. 144-17). Beyond that, the only evidence in the record concerning Dr. Isaacs' alleged requests for an accommodation is this, drawn from a note to the file written by Dr. Finn on November 29, 2011:

> He inquired about "part time" work for this year. I let him know that [the first year of a residency] is not well suited to part time work, other than alternating months off and on services. He agrees to remain at a regular schedule for now.

Id., Ex. 20 (doc. no. 134-21 (sealed)), at 10. Dr. Finn's note demonstrates neither a properly framed request for an accommodation, under Jones, nor a denial of such a request.

Based upon the foregoing, the court concludes that Dr. Isaacs has failed to establish a prima facie case that he was denied a reasonable accommodation, which entitles Dartmouth-Hitchcock to judgment as a matter of law on the failure-to-accommodate claim asserted in Count I.

17

## b. Other Disability Discrimination

Dr. Isaacs also claims that Dartmouth-Hitchcock discriminated against him by: (1) denying him permission to participate in both a research project with Dr. Paul Holtzheimer and the Leadership in Preventive Medicine Residency ("LPMR") program; and (2) subjecting him to "intense" scrutiny and unwarranted criticism.

With respect to the alleged denial of employment opportunities, defendants contend that Dr. Isaacs was not qualified for the LPMR program in the first instance. The court agrees.

On November 29, 2011, Dr. Finn met with Dr. Isaacs, and she reported the following discussion:

> Jeff requested the opportunity to pursue the LPMR program after this year. I let him know that generally the PGY-1 and 2 years must be successfully completed in order to participate in this additional training, and that this would likely not be possible for next year.

Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed)) at 11; see also Chabot Decl., Ex. L, Torrey Dep. (doc. no. 145-12) 156-57, Oct. 17, 2013 (explaining that LPMR program was for residents in good standing in other specialty areas). Dr. Finn concluded her November 29 note by stating that Dr. Isaacs "ha[d] not successfully completed [his] performance improvement plan." Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed)), at 11.

18

At his deposition, Dr. Isaacs testified that support from his program director, Dr. Finn, was a prerequisite for admission to the LPMR program and that, because she would not support him, he declined to make a formal application. See Chabot Decl., Ex. G, Isaacs Dep. (doc. no. 145-7) 291:5, Dec. 13, 2013. He further testified that when he spoke with Dr. Finn about his interest in the LPMR program in late November or early December, "[s]he said that [he] wasn't competitive and that she couldn't support [his] joining the program." Id. at 290:12-14.

Based upon the foregoing, it is undisputed that Dr. Isaacs was not qualified for the LPMR program because he had not completed the first two years of his residency in psychiatry. Thus, as to that aspect of the claim asserted in Count I, Dr. Isaacs has failed to establish his prima facie case.

The Hitchcock defendants do not, however, address Dr. Isaacs' claim that he was subjected to disability discrimination when "[d]efendant Finn denied [him] permission . . . to participate" in a research project with Dr. Holtzheimer. Am. Compl. ¶ 75. While the lack of an argument on this aspect of Dr. Isaacs' ADA claim would ordinarily preclude the court from reaching it, plaintiff's own deposition testimony demonstrates that he cannot establish the third element of his prima facie case, i.e., an adverse employment action. At his deposition, Dr. Isaacs testified that during the fall of 2011, he discussed

19

with Dr. Finn the possibility of his working with Dr. Holtzheimer on a grant-funded research project. See Chabot Decl., Ex. G, Isaacs Dep. (doc. no. 145-7) 282-86, Dec. 13, 2013. He also testified that Dr. Finn did not forbid him to submit a grant proposal, see id. 287:23, but, rather, steered him away from doing so by telling him that he was "struggling," id. at 285:10, and that "typically first-year interns don't do research," id. at 285:10-11. In other words, based upon Dr. Isaacs' own testimony, he did not pursue a research opportunity with Dr. Holtzheimer by his own choice, and there is no way the court could possibly characterize Dr. Isaacs' own decision as an adverse employment action. Thus, Dr. Isaacs cannot establish the third element of a discrimination claim based upon the fact that he did not participate in a research project with Dr. Holtzheimer.

Finally, the court turns to Dr. Isaacs' assertion that Dr. Finn's close scrutiny and criticism of his performance was yet another incident of disability discrimination. With respect to this aspect of Count I, the Hitchcock defendants' concession that Dr. Isaacs has established his prima facie case comes into play, and the court turns to the remaining steps of the McDonnell Douglas framework:

> If [the plaintiff] establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action.

20

> Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91,
> 99 (1st Cir. 2007); see also McDonnell Douglas Corp.,
> 411 U.S. at 802. If the employer offers a non-
> discriminatory reason, the burden then shifts back to
> the plaintiff to show that the employer's
> justification is mere pretext cloaking discriminatory
> animus. Freadman, 484 F.3d at 99.

Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186-87 (1st Cir.

2011) (parallel citations omitted).

Here, defendants have articulated a legitimate, non-discriminatory reason for Dr. Finn's close scrutiny and criticism of Dr. Isaacs, i.e., his poor performance as a resident. Dr. Isaacs' deficiencies, in turn, are documented by any number of communications to Dr. Finn from others involved in his training, and complaints about Dr. Isaacs' performance began shortly after he started his residency. See, e.g., Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed)), at 1-6, 15-17, 29, 31-34. Thus, the Hitchcock defendants have carried their burden at step two of the McDonnell-Douglas framework.

Dr. Isaacs has not responded to the Hitchcock defendants' summary-judgment motion. As a consequence, he has not carried his burden of showing that defendants' reason for Dr. Finn's scrutiny of his performance is pretextual. Moreover, any attempt to do so would be futile.

> "[T]here is no mechanical formula for finding
> pretext." Che v. Mass. Bay Transp. Auth., 342 F.3d
> 31, 39 (1st Cir. 2003) (internal quotation marks
> omitted). Instead, "[i]t is the type of inquiry where
> 'everything depends on the individual facts.'" Id. at

21

40 (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999)). The inquiry focuses on whether the employer truly believed its stated reason for taking action adverse to the employee. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000).

Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013). It is undisputed that Dr. Finn began paying close attention to Dr. Isaacs after she had received multiple critical assessments of both his medical skills and other aspects of his performance, including punctuality, preparedness, and communication. There is simply no basis in the record for doubting that Dr. Finn believed that Dr. Isaacs was struggling as a resident and that his struggles merited the enhanced scrutiny she gave his performance.

### c. Retaliation

Finally, in addition to asserting that the close scrutiny he was given was discriminatory, Dr. Isaacs also asserts that Dr. Finn's close supervision and criticism were acts of retaliation. The Hitchcock defendants do not address that aspect of Count I. Under normal circumstances, that would preclude the court from granting Dartmouth-Hitchcock summary judgment on that claim, but not here. As for the mechanics of an ADA retaliation claim, the court of appeals has recently explained:

> A retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn

22

from cases arising under Title VII.  See Freadman v. Metro. Prop. and Cas. Ins. Co., 484 F.3d 91, 106 (1st Cir. 2007); see also Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997) (observing that "guidance on the proper analysis of [an] ADA retaliation claim is found in Title VII cases").  To make out a prima facie retaliation claim, the plaintiff must show that: "(1) [he] engaged in protected conduct; (2) [he] experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action."  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Once the plaintiff has made a prima facie showing of retaliation, the defendant "must articulate a legitimate, non-retaliatory reason for its employment decision."  Id. at 26.  If the defendant meets this burden, the plaintiff must show that the proffered legitimate reason is pretextual and that "the job action was the result of the defendant's retaliatory animus."  Id. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993)).

Kelley, 707 F.3d at 115 (parallel citations omitted).  Given the court's determination, in the context of Dr. Isaacs' discrimination claim, that he failed to carry his burden of showing that defendants' explanation for closely scrutinizing his performance was pretextual, the court has no difficulty concluding that his retaliation claim also fails, at the third step of the McDonnell Douglas framework.

### d. Summary

Dartmouth-Hitchcock is entitled to judgment as a matter of law on Dr. Isaacs' claims that it violated the ADA by: (1) denying him a reasonable accommodation; (2) discriminating against him by denying him the opportunity to participate in the

23

LPMR program or pursue a research opportunity with Dr.

Holtzheimer; or (3) retaliating against him.

### 2. Mary Hitchcock

Mary Hitchcock is entitled to judgment as a matter of law

on Count I because Dr. Isaacs has failed to properly assert an

ADA claim against it.  The ADA provides, in pertinent part:

> The powers, remedies, and procedures set forth in
> sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and
> 2000e-9 of this title shall be the powers, remedies,
> and procedures this subchapter provides . . . to any
> person alleging discrimination on the basis of
> disability in violation of any provision of this
> chapter . . . concerning employment.

42 U.S.C. § 12117(a); see also Loubriel v. Fondo del Seguro del

Estado, 694 F.3d 139, 142 (1st Cir. 2012).  42 U.S.C. § 2000e-5,

in turn, provides that "a claimant [such as Dr. Isaacs] who

seeks to recover for an asserted violation of Title I of the ADA

. . . first must exhaust administrative remedies by filing a

charge with the EEOC, or alternatively, with an appropriate

state or local agency, within the prescribed time limits."

Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st

Cir. 1999).  As for the relevant time limits, the statute

provides, in pertinent part, that

> [a] charge under this section shall be filed within
> one hundred and eighty days after the alleged unlawful
> employment practice occurred and notice of the charge
> . . . shall be served upon the person against whom
> such charge is made . . . except that in a case of an
> unlawful employment practice with respect to which the
> person aggrieved has initially instituted proceedings

24

with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier . . . .

42 U.S.C. § 2000e-5(e)(1). Dr. Isaacs served a charge on Dartmouth-Hitchcock, but has never served a charge on Mary Hitchcock. The time for doing so has long passed. Thus, Dr. Isaacs' ADA claim against Mary Hitchcock is barred, see Bonilla, 194 F.3d at 278 (citations omitted), which entitles Mary Hitchcock to judgment as a matter of law on Count I.

### 3. The Trustees

Dr. Isaacs has never served the College with a charge of discrimination, and the time for doing so has passed. Accordingly, the Trustees are also entitled to judgment as a matter of law on Dr. Isaacs' ADA claim.

### B. Count II

In Count II, Dr. Isaacs asserts a claim for wrongful discharge against Dartmouth-Hitchcock. Specifically, he claims that Dartmouth-Hitchcock violated the common law of New Hampshire by discharging him for: (1) notifying the president of the Dartmouth College, on January 15 and February 6, 2011, of "alleged violations of Dartmouth's Business ethics guidelines,"

25

Am. Compl. ¶ 81; (2) filing an official ethics complaint with the president on January 15; and (3) filing a complaint under the Health Insurance Portability and Accountability Act, which Dartmouth-Hitchcock learned of on March 16, three days before he was dismissed from his residency. Dartmouth-Hitchcock is entitled to summary judgment on Count II because even assuming that Dr. Isaacs was an at-will employee of Dartmouth-Hitchcock, a proposition that is subject to legitimate dispute, the undisputed evidence demonstrates that he was not discharged for engaging in conduct that public policy would encourage.

The court begins by describing the elements of Dr. Isaacs' claim.

> In order to succeed on a wrongful discharge claim, a plaintiff must establish two elements: (1) that the discharge was "motivated by bad faith, retaliation or malice"; and (2) that the plaintiff was discharged "for performing an act that public policy would encourage or for refusing to do something that public policy would condemn."

Leeds v. BAE Sys., 165 N.H. 376, 379 (2013) (quoting Karch v. BayBank FSB, 147 N.H. 525, 536 (2002)). Here, presuming that dismissal from his residency is the legal equivalent of being discharged, defendants have produced a substantial amount of evidence that Dr. Isaacs was discharged for: (1) his poor performance as a resident; and (2) his dishonesty during the application process. Regarding the former, the record includes: (1) documentation of extensive discussion among multiple

26

Dartmouth-Hitchcock doctors concerning Dr. Isaacs' performance deficiencies; (2) documentation concerning Dr. Isaacs' placement on a PIP and associated follow-up; (3) documentation of the meeting at which Dr. Isaacs was placed on administrative leave; and (4) Dr. Isaacs' letter of dismissal.  Dartmouth-Hitchcock's long, well-documented history of dealing with Dr. Isaacs, and attempting to help him overcome his performance deficiencies, is evidence that he was discharged for failing to correct those deficiencies.  For his part, Dr. Isaacs has produced no evidence to create a triable issue of fact on the reasons for his discharge.  Thus, the court is compelled to rule, as a matter of law, that Dr. Isaacs was discharged for the reasons stated in his letter of dismissal, i.e., his poor performance as a resident and his dishonesty when applying to Dartmouth-Hitchcock.

Having determined that there is no genuine issue of material fact concerning the reasons why Dr. Isaacs was dismissed, see Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (explaining that a factual "dispute [is] genuine if a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party") (citation and internal quotation marks omitted), the court turns to the issue of public policy.  "[O]rdinarily the issue of whether a public policy exists is a question for the jury."  Leeds, 165 N.H. at

27

379 (quoting Short v. Sch. Admin. Unit No. 16, 136 N.H. 76, 84 (1902)).  Here, however, because the court is confident that there is no public policy that would encourage a medical resident to perform his duties poorly, or misrepresent his educational background when applying for a residency, this is one of those cases where "the presence or absence of . . . a public policy is so clear that [the] court may rule on its existence as a matter of law, and take the question away from the jury."  Leeds, 165 N.H. at 379 (citation omitted).  Because, as a matter of law, the conduct for which Dr. Isaacs was discharged included no acts that public policy would encourage, Dartmouth-Hitchcock is entitled to judgment as a matter of law on Count II.

C. Count III

In Count III, Dr. Isaacs asserts claims under RSA 354-A against the three institutional defendants.  They argue that they are entitled to summary judgment due to Dr. Isaacs' failure to file a complaint with the New Hampshire commission for human rights.  They are correct.

Under New Hampshire's Law Against Discrimination, a person wishing to bring a civil action seeking redress for a violation of RSA 354-A may do so only "at the expiration of 180 days after the timely filing of a complaint with the commission, or sooner if the commission assents in writing."  RSA 354-A:21-a, I.

28

Here, as Dr. Isaacs has neither alleged nor produced evidence that he ever filed a complaint with the commission, and as the time for doing so has passed, see RSA 354-A:21, III, the three institutional defendants are entitled to judgment as a matter of law on Count III.

### D. Count IV

In Count IV, Dr. Isaacs asserts a claim for breach of contract against Dartmouth-Hitchcock. The precise contours of that claim are somewhat difficult to ascertain. Accordingly, the court quotes liberally from the amended complaint:

> Plaintiff signed and accepted an Agreement of Appointment an[d] eight additional forms, applications, an[d] agreements sent to him by [Dartmouth-Hitchcock] human resources.
>
> . . . .
>
> By beginning his employment under these contracts on or around June 26th, 2011 Plaintiff was fully reliant on Defendant's promises therein. Including the Administrative Leave and termination provisions contained therein.
>
> On January 13th 2012, Defendant Finn and the rest of Plaintiff's program directors verbally informed Plaintiff that he was being placed on immediate Administrative Leave.
>
> Upon information and good faith belief, the [Dartmouth-Hitchcock] handbook, regulations, and documents provided to the Plaintiff as a new hire, require a more [thorough] written record prior [to] denying requests for accommodation, and prior to termination.

29

> [Dartmouth-Hitchcock] breached [its] own rules [and] regulations in denying Plaintiff[']s requests for accommodation and ultimately in his termination.
>
> Defendants therefore breached the contract that they had with Plaintiff, all to his detriment and damage.

Am. Compl. ¶¶ 118, 121-25. Given the sketchiness of the foregoing allegations, it is not so clear that Count IV could even survive a motion to dismiss. That said, as best the court can tell, the claim in Count IV is that Dartmouth-Hitchcock breached an agreement with Dr. Isaacs by failing to provide him with "a more thorough written record prior to denying [his] requests for accommodation, and prior to [his] termination," id. ¶ 123. Dartmouth-Hitchcock is entitled to judgment as a matter of law on Count IV.

Under New Hampshire law, "[a] breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." Audette v. Cummings, ___ N.H. ___, ___, 82 A.3d 1269, 1273 (2013) (quoting Lassonde v. Stanton, 157 N.H. 582, 588 (2008)). The only contract that Dr. Isaacs identifies with any specificity in his amended complaint, and the only contract document in the summary-judgment record, is the employment agreement between Dr. Isaacs and Mary Hitchcock. While Dr. Isaacs alleges that he signed other "agreements sent to him by [Dartmouth-Hitchcock] human resources," Am. Compl. ¶ 118, his amended complaint does

30

not specifically identify any such agreements or describe their contents.

Dr. Isaacs alleges, generally, in paragraph 123, that a "handbook, regulations and documents" provided to him by Dartmouth-Hitchcock at the start of his residency required Dartmouth-Hitchcock to provide him with a "more thorough written record" than the one he received. But, he never alleges: (1) what, precisely, he was due; (2) what, in fact, he received; and (3) how the written record provided to him was less than what he was due. Moreover, Dr. Isaacs alleges no facts that would establish that by breaching its own rules and regulations, Dartmouth-Hitchcock breached any agreement it had made with him. On the other hand, the employment agreement between Mary Hitchcock and Dr. Isaacs includes a provision that incorporates, into that agreement, "[t]he Graduate Medical Education Policies and Procedures Manual for Residents and Fellows." Defs.' Mem. of Law, Ex. 18 (doc. no. 144-19), at 1. Thus, it would appear that a failure to provide any documentation required by the Manual would be a breach of contract by Mary Hitchcock, not a breach by Dartmouth-Hitchcock.

In any event, in response to the summary-judgment motion filed by the Hitchcock defendants, in which they argue that Dartmouth-Hitchcock had no contractual relationship with Dr. Isaacs, he has produced no evidence that would create a triable

31

issue regarding the existence of any contract between himself and Dartmouth-Hitchcock or the terms thereof. Absent a contract, there can be no breach of contract, which entitles Dartmouth-Hitchcock to judgment as a matter of law on Count IV.

While there is no need to say more, the court turns, briefly, to the adequacy of the written record Dr. Isaacs was provided. As noted, his employment agreement with Mary Hitchcock incorporated, by reference, the GME Policies and Procedures Manual. Portions of the Manual are included in the summary-judgment record, as an attachment to the letter of dismissal that Dr. Isaacs received from Dartmouth-Hitchcock. See Defs.' Mem. of Law, Ex. 1 (doc. no. 144-2), at 3-6. The portion of the Manual attached to Dr. Isaacs' dismissal letter says nothing about the written record that must be provided prior to denying a request for an accommodation. But, it does include a procedure for notification of non-renewal, dismissal, or other concerns. That procedure begins with this step:

> The Resident shall be informed in writing of the documented deficiencies or allegations and of the recommendation for non-renewal, dismissal or remedial training in a private meeting with the Program Director or a duly appointed representative. At this meeting or as soon thereafter as possible, the resident shall be provided with a copy of this policy.

Defs.' Mem. of Law, Ex. 1 (doc. no. 144-2), at 3. The Manual then goes on to outline an appeal process. Here, it is undisputed that: (1) Dr. Isaacs was informed of his deficiencies

32

in writing; (2) he was provided with a copy of the policy outlined in the Manual; and (3) he began, but later abandoned, the appeal process described therein.  Thus, there appears to be no basis for any claim that Dr. Isaacs' dismissal failed to comply with the requirements stated in the Manual.

To sum up, Dr. Isaacs has failed to produce evidence of any promise that Dartmouth-Hitchcock made to him but failed to perform.  Because Dartmouth-Hitchcock is the only defendant against which Dr. Isaacs has made a claim for breach of contract, Dartmouth-Hitchcock is entitled to judgment as a matter of law on the breach-of-contract claim asserted in Count IV.

E. Count V

In Count V, Dr. Isaacs asserts a claim for breach of the covenant of good faith and fair dealing, against Dartmouth-Hitchcock.  Dr. Isaacs bases Count V on Centronics Corp. v. Genicom Corp., 132 N.H. 133 (1989) and, in particular, on that opinion's statement that "an employer violates an implied term of a contract for employment at-will by firing an employee out of malice or bad faith in retaliation for action taken or refused by the employee in consonance with public policy," id. at 140 (citing Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H.

33

915, 921-22 (1981)).[3] Dartmouth-Hitchcock is entitled to judgment as a matter of law on Count V for the same reason that Count II fails; the conduct for which Dr. Isaacs was discharged included no acts that public policy would encourage.

F. Count VI

In Count VI, Dr. Isaacs asserts claims for negligent misrepresentation against all four defendants. He bases those claims upon an allegation that on one occasion, after he asked for an accommodation for his alleged disability, "[d]efendant Finn told [him] that 'accommodations are difficult to arrange for an intern.'" Am. Compl. ¶ 141. That is the only false statement alleged in Count VI. As for when that statement was made, Dr. Isaacs alleges only that it followed one of his four requests for an accommodation, see id. ¶ 67, requests that, he alleges, spanned the fall and winter of 2011, see id. ¶¶ 55, 61, 63, 65. Count VI fails because it is based upon a statement of opinion rather than a statement of material fact.

Count VI, as pled in the amended complaint, rests upon a single allegedly false statement, Dr. Finn's statement that "accommodations are difficult to arrange for an intern." Am.

---

[3] Cloutier describes two other categories of contract cases in which the covenant of good faith and fair dealing might be violated, i.e., cases "dealing with standards of conduct in contract formation," 132 N.H. at 139, and cases "dealing with . . . limits on discretion in contractual performance," id. Neither of those categories is relevant here.

Compl. ¶ 141. Because Dr. Isaacs has not further amended his complaint to include any other statements, the court limits its consideration to the single statement quoted above.

"The elements of . . . a claim [for negligent misrepresentation] are a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff." Wyle v. Lees, 162 N.H. 406, 413 (2011) (citing Snierson v. Scruton, 145 N.H. 73, 78 (2000)).

There are several different problems with Count VI. First and foremost, the statement upon which Dr. Isaacs bases his claim for negligent misrepresentation is a statement of opinion rather than a statement of fact. What one person might find difficult to arrange could well be regarded by another person as easy to arrange. Whether something is "difficult to arrange" is a quintessential statement of opinion. Statements of opinion, however, do not generally provide a proper basis for a claim of misrepresentation, see DePalantino v. DePalantino, 139 N.H. 522, 523 (1995), and there are no allegations in the amended complaint that would support a deviation from that general rule, see id. (citing Shafmaster v. Shafmaster, 138 N.H. 460, 464 (1994); Eno Brick Corp. v. Barber-Greene Co., 109 N.H. 156, 158 (1968)).

Dr. Isaacs' allegations concerning the falsity of Dr. Finn's statement reinforce the court's conclusion that the

35

statement is an unactionable statement of opinion. After quoting Dr. Finn's statement, the amended complaint continues: "This representation was untruthful because [Dartmouth-Hitchcock] is required by law to make reasonable accommodations for all employees with disabilities under the ADA, NH RSA 358:A[4] and Section 504 of the Rehabilitation Act of 1973." Am. Compl. ¶ 142.

Assuming, for the sake of argument, that Dartmouth-Hitchcock did have some legal obligation to provide Dr. Isaacs with a reasonable accommodation, and that the statement at issue was a statement of fact rather than a statement of opinion, the existence of such an obligation has no bearing on the accuracy of Dr. Finn's statement. All Dr. Finn is alleged to have said is that an accommodation for an intern would be difficult to arrange. For that statement to be inaccurate, it must have been the case that accommodations for interns were <u>not</u> difficult to arrange, and Dr. Isaacs has alleged no facts to support that proposition, nor has he produced any evidence at summary judgment to create a triable dispute on this issue.

To summarize, all four defendants are entitled to judgment as a matter of law on the claim for negligent misrepresentation asserted in Count VI, because the statement on which that claim

---

[4] The court presumes that Dr. Isaacs intended to refer to RSA 354-A, <u>i.e.</u>, New Hampshire's Law Against Discrimination.

is based is an unactionable statement of opinion rather than a statement of material fact.

G. Count VII

In Count VII, Dr. Isaacs asserts claims for discrimination and retaliation under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), against Dartmouth-Hitchcock, Mary Hitchcock, and the Trustees. Specifically, he claims that those defendants discriminated against him by denying him a reasonable accommodation for his disabilities, and that they either discriminated or retaliated against him by denying him: (1) permission to participate in the LPMR program; and (2) access to a research opportunity with Dr. Holtzheimer.[5] The Dartmouth defendants argue that the Trustees are entitled to summary judgment on Count VII because: (1) Dr. Isaacs never applied to participate in any Dartmouth program that received federal funding; and (2) he was not qualified for any of the programs he applied for, given his inability to keep up with his regular workload. For reasons that are not clear, the Dartmouth

---

[5] Dr. Isaacs alleges, in paragraphs 159 and 160, that he was denied permission to work with Dr. Holtzheimer, and also alleges, in paragraph 166, that he "was also denied opportunities to participate in research at DMS." While that would suggest a claim that he was denied research opportunities beyond the one with Dr. Holtzheimer, Dr. Isaacs made clear at his deposition that the only research opportunity he claims to have been denied was the one with Dr. Holtzheimer. See Chabot Decl., Ex. G, Isaacs Dep. (doc. no. 145-7) 282:4-8, Dec. 13, 2013.

Defendants do not address, in any way, Dr. Isaacs' claim that they are liable to him under the Rehabilitation Act for failing to provide him with a reasonable accommodation, nor do they specifically address his retaliation claims. The Hitchcock defendants argue that they are entitled to summary judgment on Count VII for the same reasons that entitle them to summary judgment on the ADA claim asserted in Count I. The court considers, in turn, the arguments made by the Dartmouth defendants and the Hitchcock defendants.

### 1. The Dartmouth Defendants' Arguments

The Dartmouth defendants first argue that Dr. Isaacs' Rehabilitation Act claim fails because, even though some of Dartmouth College's programs "arguably receive[] grant funding for faculty research projects, plaintiff never applied to those programs." Defs.' Mem. of Law (doc. no. 133-1) 14. That argument is unavailing.

The court begins with the language of the Rehabilitation Act, which provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

29 U.S.C. § 794(a). Three decades ago, the United States Supreme Court held that the foregoing language limited the

38

Rehabilitation Act's "ban on discrimination to the specific program that receives federal funds." CONRAIL v. Darrone, 465 U.S. 624, 635 (1984). But, Congress subsequently amended the statute to broaden its coverage. Shortly thereafter, the court of appeals explained:

> At the time the complaint [in the case before it] was filed, the Supreme Court had interpreted section 504 to apply only to specific programs that received federal financial aid, and not to programs that received no federal financial aid, even if other programs within the same institution received federal financial aid. Grove City College v. Bell, 465 U.S. 555 (1984); Consolidated Rail Corp. v. Darrone, 465 U.S. 624 (1984).
>
> In 1988, however, Congress amended section 504 by passing the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28, 29 (1988) (the 1988 amendments), which was designed to "overturn" the holding of the Supreme Court's decisions in Grove City and Darrone. See S. Rep. No. 64, 100th Cong., 2nd Sess. 2, reprinted in 1988 U.S. Code Cong. & Admin. News 3, 3-4. The Civil Rights Restoration Act mandates that any program in an institution that receives federal financial aid, no matter how specific the purpose or program for which that aid is given, must follow the guidelines of the Rehabilitation Act of 1973.

Leake v. L.I. Jewish Med. Ctr., 869 F.2d 130, 131 (2d Cir. 1989) (parallel citations omitted); see also DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1383-84 (10th Cir. 1990); Lussier v. Dugger, 904 F.2d 661, 663-64 (11th Cir. 1990)). Thus, the Act now provides that "the term 'program or activity' means all the operations of . . . a college, university, or other postsecondary institution . . . or . . . an entire

corporation . . . any part of which is extended Federal financial assistance." 42 U.S.C. §§ 794(b)(2)(A) & (b)(3)(A).

As a result of Congress's amendment of the Rehabilitation Act, the proper test for determining whether the Trustees may be subject to liability under it is not whether Dr. Isaacs applied to or participated in a specific Dartmouth College program that received federal funding but, rather, whether any part of Dartmouth College receives any federal financial assistance. Dr. Isaacs makes no such allegation in his amended complaint. Therefore, Count VII may well have been vulnerable to dismissal, for failure to state a claim, if the Trustees (or either of the other two institutional defendants) had filed a Rule 12(b)(6) motion based upon Dr. Isaacs' failure to allege that they received federal funds. But that ship seems to have sailed, and here we are at summary judgment.

Rather than being able to get by on the deficiencies of Dr. Isaacs' amended complaint, the Trustees, in the current procedural posture, must produce uncontroverted evidence that Dartmouth College receives no federal funds. They have not done so and, to the contrary, have come close to conceding that Dartmouth College does, in fact, receive some federal funding, albeit for programs in which Dr. Isaacs did not take part. The long and the short of it is that, notwithstanding Dr. Isaacs' failure to allege that Dartmouth College receives federal funds,

the Trustees are not entitled to judgment as a matter of law on Dr. Isaacs' Rehabilitation Act claim based upon their argument concerning federal funding. Cf. Lee v. Trs. of Dartmouth Coll., 958 F. Supp. 37 (D.N.H. 1997) (reaching the merits of neurosurgery resident's Rehabilitation Act claim against the Trustees of Dartmouth College, Dartmouth-Hitchcock, and Mary Hitchcock).

The Dartmouth defendants next argue that that even if Dartmouth College did deny Dr. Isaacs access to the LPMR program, the Trustees cannot be liable to him for discrimination under the Rehabilitation Act because he was not qualified, in the first instance, to participate in that program. Given that "the same standards apply to both the Rehabilitation Act and ADA," Enica v. Principi, 544 F.3d 328, 338 n. 11 (1st Cir. 2008) (citing Calero-Cerezo, 355 F.3d at 23); see also 29 U.S.C. § 794(d), the court's determination that Dr. Isaacs failed to establish a prima facie case of discrimination under the ADA based upon Dr. Finn's decision not to support his participation in the LPMR program also entitles the Trustees to judgment as a matter of law on Dr. Isaacs' parallel Rehabilitation Act discrimination claim. The same reasoning necessarily applies to the portion of Count VII in which Dr. Isaacs claims that Dartmouth College discriminated against him in violation of the

41

Rehabilitation Act when Dr. Finn dissuaded him from pursuing a research project with Dr. Holtzheimer.

As noted, the Dartmouth defendants do not address Dr. Isaacs' Rehabilitation Act accommodation claim in their motion for summary judgment. That omission, however, is of no moment because the court's determination that Dr. Isaacs did not establish his ADA accommodation claim applies with full force to the accommodation claim he asserts under the Rehabilitation Act in Count VII. See Enica, 544 F.3d at 338 n.11.

The retaliation claims that Dr. Isaacs asserts against the Trustees in Count VII, however, stand on a somewhat different footing than the discrimination claims. Count I includes a retaliation claim based upon Dr. Finn's intensive scrutiny of Dr. Isaacs, but no retaliation claim based upon the way in which Dr. Finn responded to Dr. Isaacs' interests in the LPMR program and doing research with Dr. Holtzheimer. Accordingly, the court's disposition of Count I does not dictate its disposition of the retaliation claims asserted Count VII. Thus, the court must address those claims more specifically.

As for the elements of a retaliation claim under the Rehabilitation Act,

> the plaintiff can make out a prima facie case by "show[ing] that (1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal

42

connection between the protected conduct and the adverse action."

Palmquist v. Shinseki, 689 F.3d 66, 70 (1st Cir. 2012) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 41 (1st Cir. 2012)).  The McDonnell Douglas framework is also used to evaluate retaliation claims under the Rehabilitation Act.  See Palmquist, 689 F.3d at 70-71.

As to the first element of Dr. Isaacs' prima facie case, it is clear that seeking a reasonable accommodation is protected conduct under the Rehabilitation Act, see Kelley, 707 F.3d at 115; Enica, 544 F.3d at 338 n.11, and that is the conduct on which Dr. Isaacs bases his retaliation claims in Count VII. While Dr. Isaacs' amended complaint alleges nearly a half dozen requests, the summary-judgment record includes evidence on just one, made in late November of 2011.  While the timing of that request calls into question Dr. Isaacs' ability to establish the causation element of his prima facie case, given his testimony concerning the timing of the allegedly retaliatory acts, the court will presume that Dr. Isaacs can establish the first and third elements of his prima facie case.

It is not so clear, however, that Dr. Isaacs has established the second element.  For the purposes of a retaliation claim under the Rehabilitation Act, "[a]n adverse action is one that might well dissuade a reasonable person from

making or supporting a charge of discrimination." Esposito, 675 F.3d at 41 (citing Colón-Fontánez v. Mun'y of San Juan, 660 F.3d 17, 36-37 (1st Cir. 2011); Reinhardt v. Albuq. Pub. Schs. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)). Here, viewing Dr. Isaacs' deposition testimony in the light most favorable to him, Dr. Finn encouraged him not to apply for a grant to work with Dr. Holtzheimer, by pointing out his struggles as a first-year resident, and she declined to support an application for admission into the LPMR program, which resulted in his deciding not to submit one. Dr. Isaacs' own testimony demonstrates that in neither instance did Dr. Finn take any actual action but, rather, discussed the Holtzheimer research project and the LPMR program with Dr. Isaacs, with the result that he decided not to apply for either. It is rather a stretch to characterize anything that Dr. Finn did as an employment action and even more of a stretch to conclude that her conduct toward Dr. Isaacs would have dissuaded a reasonable person from making a charge of discrimination. Even so, the court will presume that Dr. Isaacs has established his prima facie case.

As with Dr. Isaacs' retaliation claim under the ADA, his Rehabilitation Act retaliation claim fails at the third step of the McDonnell Douglas framework. The summary-judgment record is replete with evidence concerning the legitimate non-discriminatory reasons why Dr. Finn dissuaded Dr. Isaacs from

44

applying for a grant to do research with Dr. Holtzheimer, i.e.,

his struggles as a first-year resident, and why she declined to

support his application for the LPMR program, i.e., the fact

that he would be applying, as a first-year resident, for a

program that is generally open to those who have completed two

years of residency.

By failing to oppose the Dartmouth defendants' summary-

judgment motion, Dr. Isaacs has, necessarily, failed to produce

evidence that the reasons given for Dr. Finn's actions were

pretextual.  On the other hand, the record contains a

substantial amount of evidence demonstrating that they were not.

When Dr. Finn mentioned Dr. Isaacs' struggles as a resident as a

reason for dissuading him from applying for a research grant,

she had heard of his shortcomings from many different people at

Dartmouth-Hitchcock and Mary Hitchcock, and he had been both

dismissed from the medical service and placed on a PIP.  There

is simply no basis for questioning the sincerity of Dr. Finn's

belief that Dr. Isaacs was struggling as a resident, and was ill

suited to take on the additional responsibilities of a research

project.  The basis for Dr. Finn's belief that Dr. Isaacs was

unqualified for the LPMR program is similarly self-evident.  At

the time she declined to give her endorsement, he was a

struggling first-year resident, on a PIP, who wanted to apply

for a program open to residents who had completed their first

two years.  Again, there is no basis for questioning the sincerity of Dr. Finn's belief that Dr. Isaacs was unqualified for the LPMR program.

Because Dr. Isaacs has produced no evidence from which the court could conclude that the reasons given for his treatment by Dr. Finn were pretextual, the Trustees are entitled to judgment as a matter of law on Dr. Isaacs' retaliation claims under the Rehabilitation Act.

### 2. The Hitchcock Defendants' Arguments

The Hitchcock defendants are entitled to judgment as a matter of law on Count VII for reasons discussed in detail above: (1) Dr. Isaacs' reasonable-accommodation claim fails because he never properly requested an accommodation; (2) his discrimination claim pertaining to participation in the LPMR program fails because he has not established the second element of his prima facie case, i.e., that he was qualified for that program; (3) his discrimination claim pertaining to research with Dr. Holtzheimer fails because Dr. Isaacs has not established the third element of his prima facie case, i.e., an adverse employment action; and (4) his retaliation claims fail because he has produced no evidence to demonstrate that the reasons given for Dr. Finn's actions were pretextual.

46

H. Count VIII

In Count VIII, Dr. Isaacs asserts claims for fraud against all four defendants. He bases those claims on three allegedly false statements, described in his amended complaint as follows:

> Defendants throughout Plaintiff's employment, knowingly, or with conscious indifference, misrepresented Plaintiff's performance as a resident physician. Such representations had the effect of causing Plaintiff's reputation as an employee to be irreparably harmed.
>
> . . . .
>
> On January 13, 2012 at approximately 9:15 AM, Plaintiff was fraudulently threatened while in a meeting with Defendant Finn and another senior professor.
>
> . . . .
>
> On March 19, 2012 Plaintiff received a letter terminating his employment. The letter falsely alleged that he had been on formal Administrative Leave.

Am. Compl. ¶¶ 174, 180, 186. Focusing on the "statement" alleged in paragraph 174, the Hitchcock defendants argue that they are entitled to summary judgment because the undisputed record demonstrates that statement to be true. The Dartmouth defendants argue, among other things, that Dr. Isaacs cannot establish reliance upon any of the statements on which he bases his fraud claim. Neither motion for summary judgment addresses the "statements" alleged in paragraphs 180 and 186.

47

As to the elements of a claim for fraud, or intentional misrepresentation, the New Hampshire Supreme Court has explained:

> "'[O]ne who fraudulently makes a misrepresentation . . . for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.'" Gray v. First NH Banks, 138 N.H. 279, 283 (1994) (quoting Restatement (Second) of Torts § 525, at 55 (1977)). "The tort of intentional misrepresentation, or fraud, must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing another person to rely on the representation." Patch v. Arsenault, 139 N.H. 313, 319 (1995). "In order to withstand a motion to dismiss, the plaintiff must specify the essential details of the fraud, and specifically allege the facts of the defendant's fraudulent actions." Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46-47 (1987) (brackets and quotation omitted).

Tessier v. Rockefeller, 162 N.H. 324, 331-32 (2011) (parallel citations omitted, emphasis in the original).  Having described the elements of Dr. Isaacs' claim, the court turns to each of the three allegedly fraudulent statements upon which Count VII is based.

### A. Paragraph 174

To begin, the second sentence in paragraph 174, which refers to damage to Dr. Isaacs' reputation, tends to suggest a claim for defamation.  See Sanguedolce v. Wolfe, 164 N.H. 644, 646 (2013) ("To be defamatory, the complained-of language must

48

tend to lower the plaintiff in the esteem of any substantial and respectable group . . . .") (citation and internal quotation marks omitted)).  But, as Dr. Isaacs cites only the law of fraud and speaks of his reliance upon the statements at issue but not their effect on any others to whom those statements may have been published, the court presumes that Dr. Isaacs is not making a defamation claim.

It is well established, and Dr. Isaacs acknowledges, see Am. Compl. ¶ 174, that "[a] plaintiff cannot allege fraud in general terms, but must specifically allege the essential details of the fraud and the facts of the defendants' fraudulent conduct."  Snierson, 145 N.H. at 77 (citing Proctor v. Bank of N.H., N.A., 123 N.H. 395, 399 (1983)).  Dr. Isaacs' allegation, in paragraph 174 of the amended complaint, that "[d]efendants throughout [his] employment, knowingly, or with conscious indifference, misrepresented his performance as a resident physician," falls far short of the required level of specificity, which is why the court places quotation marks around the word "statement" in its discussion of paragraph 174.

After scouring the amended complaint, the court was able to locate two other statements upon which Dr. Isaacs may have intended to base his fraud claim.  First, in support of the claim asserted in Count III, Dr. Isaacs alleges that "[u]pon starting work at [Dartmouth-Hitchcock he] was the subject of

intense, unwarranted criticism." Am. Compl. ¶ 96. By calling his criticism "unwarranted," Dr. Isaacs appears to assert that while being criticized, his critics told him things about his performance that were not true. Precisely what untrue things they may have said, the amended complaint does not say.

Then, in support of the claims asserted in Counts I, III, VII, Dr. Isaacs alleges that in response to his request for support of his application to participate in the LPMR program, Dr. Finn told him "that he 'wasn't competitive enough.'" Id. ¶ 77; see also id. ¶¶ 114, 163. Apart from offering a conclusory allegation that he had "credentials that [met] or exceed[ed] the criteria required to participate in the [LPMR] program," id. ¶ 115, an allegation that is entirely at odds with the record evidence that Dr. Isaacs was a first-year resident on a PIP when he spoke with Dr. Finn about getting into a program that was generally open to residents who had completed their second years, Dr. Isaacs offers no further details concerning Dr. Finn's statement or its purported falsity. As with the allegation in paragraph 174, Dr. Isaacs' allegations concerning unwarranted criticism and Dr. Finn's statement about his qualifications for the LPMR program fall short of the level of specificity required to state a claim for fraud.

Notwithstanding the patent failure of Dr. Isaacs' amended complaint to state an adequately specific claim for fraud, the

50

Hitchcock defendants defend against that claim on the merits. Without the specific allegations to which they are entitled by both Tessier, 162 N.H. at 332, and Rule 9(b) of the Federal Rules, they appear to argue, in a general way, that none of the things that may have been said about Dr. Isaacs' performance could possibly have been false because he was, in fact, a bad resident. Given the court's inability to address Dr. Isaacs' fraud claim on a statement-by-statement basis, due to Dr. Isaacs' failure to adequately allege fraud, the better approach to Count VIII is to focus, as the Dartmouth defendants do, on the element of reliance.[6]

The court begins by acknowledging one rather unusual aspect of the "statements" alleged in paragraph 174 as underlying Dr. Isaacs' fraud claim. Rather than being statements about something over which the speaker had superior knowledge, those statements, as vaguely as they are alleged, were statements made to Dr. Isaacs about his own performance. One would think that nobody would know more about Dr. Isaacs' performance than Dr. Isaacs himself. Be that as it may, Dr. Isaacs' basic argument is that: (1) Dr. Finn and others, knowing him to be a good

---

[6] That said, the court notes that based upon its determination, when ruling on Count I, that the record included evidence that Dr. Finn's close scrutiny of Dr. Isaacs was justified by all the criticisms of his performance that she had received, there is ample support in the record for the general proposition that Dr. Isaacs was not a good resident.

51

resident falsely told him that he was a bad resident; (2) he believed them; and (3) he had to endure the stress of believing himself to be a bad resident when, in fact, he was a good one. That theory of reliance, however, is belied by undisputed evidence in the summary-judgment record.

Specifically, the record includes documents, some written by Dr. Isaacs himself, demonstrating that he disagreed with many of the negative assessments of his performance.  For example, in a July 3, 2011, e-mail to Dr. Friedman, sent in response to being removed from the medical service, Dr. Isaacs reported that over the preceding weekend, he had: (1) filed his progress notes earlier than usual, see Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed)), at 19; and (2) "handled a cardiology situation more calmly than the resident," id.  In a September 26 e-mail to Dr. Finn, regarding his PIP, Dr. Isaacs stated his belief that "sometimes [his] orders were criticized [when they] were, in fact correct." Id. at 8.  On December 26, Dr. Isaacs sent Dr. Douglas Noordsy an e-mail in which he defended himself against a criticism for failing to change a patient's medication order. See id. at 26.

Beyond that, the record also includes statements by others in which they reported instances in which Dr. Isaacs challenged criticisms of his performance.  See Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed), at 4 (October 1 resident evaluation

reporting Dr. Isaacs' justification for deciding not to write a treatment note); id. at 10 (November 19 meeting note reporting Dr. Isaacs' focus on justifying his medical decision making); id. at 33 (January 11, 2012, e-mail from Dr. Friedman to Dr. Finn, reporting Dr. Isaacs' explanation for misleading treatment note). Finally, as Dr. Finn reported in her memorandum on the meeting at which Dr. Isaacs was placed on administrative leave, even at that late date, he expressed his belief that the issues that Dr. Friedman discussed with him were "'not as bad' as the medical[] service has made [them] out to be." Defs.' Mem. of Law, Ex. 23 (doc. no. 134-24 (sealed)), at 1.

In sum, defendants have produced a substantial amount of uncontroverted evidence that throughout his tenure as a resident, Dr. Isaacs retained the capacity to challenge negative assessments of his performance, which demonstrates that he did not, in fact, believe them. And, if he did not believe those statements, he could hardly have relied upon them.

## B. Paragraph 180

Paragraph 180 asserts Dr. Isaacs' claim that he "was fraudulently threatened while in a meeting [on January 13, 2012] with Defendant Finn and another senior professor." Am. Compl. ¶ 180. As best the court can tell, the "fraudulent threat" to which Dr. Isaacs refers consisted of false statements about his performance made at the meeting in which he was threatened with

53

dismissal from his academic program.  As for reliance, the amended complaint says this:

> Plaintiff was justified in relying on the Defendants' misrepresentation [of his performance]. As an employee he had every right and expectation to trust that his Program Directors' statements and evaluations were accurate, true, and fair.
>
> As a result of the Defendants' misrepresentations [at the January 13 meeting] Plaintiff worked for months with the stress of believing his job performance was less than satisfactory.

Id. ¶¶ 183-84.  As the court has already explained, defendants have produced undisputed evidence that thoroughly undermines Dr. Isaacs' theory of reliance.  The fraud claim based upon paragraph 180 also fails for an even more fundamental reason. It is undisputed that Dr. Isaacs was placed on administrative leave immediately after the January 13 meeting.  Thus, nothing that was said during that meeting could possibly have resulted in Dr. Isaacs working for months under the stress of believing false statements about the quality of his performance.

C. Paragraph 186

In paragraph 186 of his amended complaint, Dr. Isaacs states that the letter dismissing him from Dartmouth-Hitchcock "falsely alleged that he had been on formal Administrative Leave."  The amended complaint, however, does not even attempt to explain how Dr. Isaacs might have relied upon that statement, and the court is a loss as to how he might establish that

54

element of his claim.  Moreover, it is undisputed that shortly after receiving the letter containing that statement, Dr. Isaacs began to engage in the Dartmouth-Hitchcock grievance procedure, filed a charge with the EEOC, and filed his first action in this court.  Thus, the undisputed record refutes any argument that Dr. Isaacs relied upon the statement in paragraph 186, to his detriment, by declining to pursue the remedies available to him.  Absent justifiable reliance, there can be no claim for fraud based upon the statement in paragraph 186.

### D. Summary

Even when the record in this case is viewed in the light most favorable to Dr. Isaacs, see Winslow, 736 F.3d at 29, there is no evidence that Dr. Isaacs relied, to his detriment, on any of the statements that form the basis for his fraud claim.  Thus, defendants are entitled to judgment as a matter of law on the claim asserted in Count VIII.

### I. Count IX

In Count IX, Dr. Isaacs asserts claims for intentional infliction of emotional distress, against all four defendants.  In the words of the amended complaint:

> This case is one of the few cases where actions of a Defendant can be found to rise to the high bar of atrocious, and utterly intolerable in a civilized community.

55

> Here, the Defendants' agents were not only Plaintiff's direct supervisors, they were also trained psychologists.
>
> Defendants[] had notice and knowledge of Plaintiff's neuropsychiatric disability. Further, because it is their field of study Defendant[]s had actual knowledge of what that condition consisted of, specifically what would cause that condition to intensify.
>
> Using that knowledge Defendants[] intentionally put the Plaintiff through a series of work place tests to determine the amount of stress the Defendant could take with his condition.

Am. Compl. ¶¶ 191-94 (internal quotation marks and citation omitted). Dr. Isaacs further alleges that the "work place tests" to which he was subjected "were performed with the intention of forcing [him] to resign his position." Am. Compl. ¶ 196. Defendants are entitled to judgment as a matter of law on Count IX because the alleged conduct underlying the claims stated therein is not sufficiently egregious to support a claim for intentional infliction of emotional distress.

"In order to make out a claim for intentional infliction of emotional distress, a plaintiff must allege that a defendant 'by extreme and outrageous conduct, intentionally or recklessly cause[d] severe emotional distress to another.'" Tessier, 162 N.H. at 341 (quoting Morancy v. Morancy, 134 N.H. 493, 496 (1991)).

> In determining whether conduct is extreme and outrageous, it is not enough that a person has acted with an intent which is tortious or even criminal, or

56

that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 729 (2009) (citation and quotations omitted). Rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id.

Tessier, 162 N.H. at 341 (parallel citation omitted).

The court begins with one of the factual bases for Dr. Isaacs' claim. While Dr. Isaacs alleges that "[d]efendants[] had notice and knowledge of [his] neuropsychiatric disability," Am. Compl. ¶ 193, it is undisputed that in the paperwork he submitted upon accepting Dartmouth-Hitchcock's offer of admission, he represented that he had no disability and did not require any accommodations. See Defs.' Mem. of Law, Ex. 16 (doc. no. 144-17) (emphasis added). Thus, at least with respect to the first part of Dr. Isaacs' residency, the undisputed record demonstrates that defendants had no reason to believe that he suffered from a mental disability. And, at her deposition, Dr. Finn testified that "at the time [she] was working with [Dr. Isaacs, she] was not in the capacity to be evaluating [him] as a physician." Defs.' Mem. of Law, Ex. 29, Finn Dep. (doc. no. 144-30) 25:20-22, Jan. 15, 2014. That said, the record is clear that by the time Dr. Isaacs was put on his PIP in mid September, Dr. Finn was aware that he was claiming to

57

suffer from conditions that could have been symptoms of a mental disability. Specifically, the PIP directed Dr. Isaacs to:

1. Make sure to engage in self care activities so that you can be well rested in preparation for work[; and]

2. Consider EAP . . . or other therapy assessment for help with coping with work stress[.]

Defs.' Mem. of Law, Ex. 21 (doc. no. 134-22 (sealed)), at 2.

Turning to Dr. Isaacs' theory of liability for intentional infliction of emotional distress, the court has little trouble concluding that it would be intolerable in a civilized community for medical educators to conduct secret experiments upon an unwitting subject with the purpose of driving him out of an academic program. The problem with Dr. Isaacs' claim, however, is that the undisputed factual record demonstrates that that Dr. Finn and others responsible for training Dr. Isaacs went to great lengths to help him remain in the program and have a successful residency.

Specifically, it is undisputed that: (1) Dr. Friedman made an attempt, ultimately unsuccessful, to salvage Dr. Isaacs' first rotation in internal medicine by reducing his patient load, see Defs.' Mem. of Law, Ex. 20 (doc. no. 134-21 (sealed)), at 13-18, 20; (2) Dr. Isaacs was given numerous substantive suggestions about how to improve his performance, see id. at 7, 9, 20, 24-28; (3) arrangements were made to shift Dr. Isaacs'

58

rotation schedule, so he could return to internal medicine after he had developed the necessary skills in other departments, see id. at 17; and (4) notwithstanding the fact that Dr. Friedman would have dismissed Dr. Isaacs from Dartmouth-Hitchcock in early July, see id. at 16, Dr. Finn placed him on a PIP in September, see id., Ex. 21 (doc. no. 134-22 (sealed)). Dr. Isaacs' PIP, in turn, included the following provision:

> During this improvement period, residency staff members will provide additional support and supervision to you. You will meet on a weekly basis with Dr. West to discuss feedback on rotation regarding core competency issues that may arise as a part of your work on the inpatient unit. You will meet with a senior resident . . . on an at least weekly basis to interview a patient together and practice presentations. For all calls, you will have a more senior resident present for direct supervision. I will also plan to meet with you to review use of templates and tips for organization.

Id. at 2.

Because the undisputed record provides no support whatsoever for Dr. Isaacs' theory of liability for intentional infliction of emotional distress, all four defendants are entitled to judgment as a matter of law on Count IX.

J. Count X

In Count X, Dr. Isaacs asserts claims for negligent infliction of emotional distress, against all four defendants. Specifically, he asserts that by breaching several different statutory and common-law duties, defendants caused him to suffer

59

emotional distress that resulted in "an acute-on-chronic stress reaction that caused [him] to seek immediate treatment." Am. Compl. ¶ 207. All four defendants are entitled to judgment as a matter of law because Dr. Isaacs has not disclosed an expert witness to provide evidence on the causal relationship between defendants' acts and the physical symptoms that allegedly resulted therefrom.

"The elements of a claim for negligent infliction of emotional distress include: '(1) causal negligence of the defendant; (2) foreseeability; and (3) serious mental and emotional harm accompanied by objective physical symptoms.'" Tessier, 162 N.H. at 342 (quoting O'Donnell v. HCA Health Servs. of N.H., Inc., 152 N.H. 608, 611 (2005) (citation omitted). In O'Donnell, the New Hampshire Supreme Court also explained that, "[t]o ensure that the emotional injury is sufficiently serious to be afforded legal protection as well as to establish causation, we have repeatedly held that 'expert testimony is required to prove physical symptoms suffered from alleged negligent infliction of emotional distress.'" 152 N.H. at 611-12 (quoting Silva v. Warden, N.H. State Prison, 150 N.H. 372, 374 (2003)).

Here, Dr. Isaacs has disclosed no expert who will testify about physical manifestations of his emotional distress, and the

60

deadline for expert disclosure has passed, see Discovery Plan (doc. no. 61) 5.  Dr. Isaacs' failure to secure an expert to testify on either the seriousness of his emotional distress or the issue of causation forecloses his claim for negligent infliction of emotional distress, and entitles all four defendants to judgment as a matter of law on Count X.  See Michnovez v. Blair, LLC, No. 10-cv-110-LM, 2012 WL 2627567, at *9-10 (D.N.H. JulY 5, 2012).

## Conclusion

As the court indicated at the outset of this order, Dr. Isaacs' motion for a scheduling conference, document no. 140, is denied.  For the reasons detailed above, the motion for summary judgment filed by the Hitchcock defendants, document no. 132, and the motion for summary judgment filed by the Dartmouth defendants, document no. 133, are both granted in full.  Because all four defendants are entitled to summary judgment on all of the claims asserted against them, the two other pending motions in this case, the Hitchcock defendants' motion to protect witnesses from harassment, document no. 126, and the Dartmouth defendants' motion to restrict plaintiff's ex parte communications, document no. 129, are both denied as moot.  The

clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

April 18, 2014

cc:  J.D. Isaacs, pro se
     Pierre A. Chabot, Esq.
     Edward M. Kaplan, Esq.
     Kathleen C. Peahl, Esq.
     Christopher James Pyles, Esq.